USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED: 3|14|12

PRO SE OFFICE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
In re:

     BARRY SISKIN,

**APPELLANT'S BRIEF**

CV 9468-2001 2011 (nrb)

          Debtor,

------------------------------X


**APPELLANT'S BRIEF**


12 Siskin, Pro-Se (7319)
R.W Pro-Se (7319)

BARRY SISKIN, PRO-SE
c/o Schrader & Schoenberg, LLP
Attorneys-at-Law
711 Third Avenue, Suite 1803
New York, New York 10017
Direct Dial # 646-255-2102

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
    In re:

             BARRY SISKIN,       **APPELLANT'S BRIEF**

                        2011
                        CV 9468-2001 (nrb)

                        Honorable Judge
                        Naomi Reice Buchwald

                Debtor,
------------------------------------X

### APPELLANT'S BRIEF

      This is an appeal from the Memorandum Decision and
Order of the Honorable Judge Stuart M. Bernstein of the
United States Bankruptcy Court, Southern District of New
York, dated and filed on November 13, 2011, which
approved the Chapter 7 Trustee's and his appointees' Fees
and Disbursements request (hereinafter, "fee request"),
which was objected to by the Debtor/Voluntary Petitioner,
BARRY SISKIN.

      The one-sided Decision and Order of the lower Court
accepted verbatim all the "facts" stated by the movants
in their motion and either rejected or ignored
virtually, if not all, of the Debtor's "sworn-to" facts,

under penalties of perjury, with no critical analysis
applied to any contradictory facts between both sides
and, in some cases, the lower court (1) *volunteered* facts
favorable to, yet not even mentioned by the movant in
this fee request motion now up on appeal (2) that were
nonetheless untrue and (3) nowhere to be found in the
Record.

Perhaps the most glaring example in this disputed fee
request is the statement on page 14 of the Order of Judge
Bernstein now up on appeal ® ), in which the Court
states:

> "...The Trustee's efforts benefited
> the estate as he managed to
> collect $453,055.03,with little or
> no help from the Debtor...".
>
>                     p.14 of 10/13/11
>                     Order of the Court,
>                     at ® )

The above statement in the Court Decision that
"...The Trustee... managed to collect (all) $453,055.03
with little or no help from the Debtor..." is off by,
say, --- $453,055.03. The Court is 100% wrong. "...The
... efforts which benefited the estate...", consisted of

3

the Plaintiff's negligence personal injury practice where every penny of the $453,055.03 coming into the practice came from hard work **done by the Debtor** on successfully completed separate cases of the hundreds of cases in the practice during the relevant period through the collection **by the Debtor** of his percentage share of the net attorney's fee after costs and disbursements.

Thus, the first (of many) unmistakable, undebatable truism in this appeal is that the relevant quotation from page 14 of the Court's Decision *should read as follows*, the opposite as written by the Court:

> "The **Debtor's** efforts benefited the estate as he managed to collect $453,055.03, with little or no help from the **Trustee**".

bold supplied

This is perhaps one of the most fundamental and fatal misunderstandings by a Court in a Decision that I have seen in three decades and a similar misunderstanding of how a plaintiff's negligence practice operates, <u>the latter</u> perhaps because such business entities rarely, if ever, seeks bankruptcy protection and, in this case, due

to the extremely *sui generis* nature, history and extremely limited reason for originally seeking Chapter 11 (and then converted to Chapter 7 by the Court) protection already explained in my Declaration in Reply ® ) to the Court below.

One last point on *my version* of that portion of the *hypothetically correct* Court Decision just "quoted" above. The $453,055.03 was not **solely** collected by the **Debtor** with **little or no help** from the Trustee. The Debtor contends that the above sum that was undeniably obtained **solely by the Debtor** would have been much higher and the "little or no help" from the Trustee would translate into a much higher figure **obtained by the Debtor** had the Debtor not spent an extraordinarily unnecessary period of his time fighting the Trustee or the Trustees' illegal directive(s), which were specifically designed not (a) to benefit (and, in fact, causing harm to) the Debtor's Plaintiffs' personal injury practice and its direct equivalent, the Estate and its Creditors, (b) but to line the Trustees' and his

5

appointees' and his friends' pockets.

All of this pales in comparison to one salient fact and that is that every penny of the $453,055.03 came into and "benefited the estate" ®  ), as stated in the Court Order, directly through one of the plaintiff's personal injury actions that the Debtor (i.e.I) personally brought into my sole practice, signed up the clients, prosecuted the claims,  placed the great majority of all cases into suit, prosecuted those suits, conducted extensive motion practice, appeared in court to argue hundreds, if not thousands of those motions, appeared in court for seemingly myriad(s) of Preliminary Conferences Status Conferences, Pre-Trial Conferences etc.: drafted, collated and/orally argued considerably many appeals in every New York State Court that I can think of in the New York City metropolitan area and some upstate, including three in the New York State Court of Appeals.

Another appeal to the New York State Court of Appeals, is Woodson v Densby 100 N.Y.2d 62, which was the impetus for this entire bankruptcy Petition, which was explained at ®  ).

I also personally prosecuted Uninsured and
Underinsured Motorist Arbitrations for my various
Plaintiffs' personal injury Claimants, personally
conducted Framed Issue Trials and Traverse Hearings for
my clients and I also negotiated settlements on cases
with various Defendants' insurance companies and
self-insured and non-insured Defendants and arranged for
and participated in plenary trials.

Ordinarily, the last two paragraphs would be
self-evident and unnecessary. However, their necessity
became painfully obvious when the Court stated that
"...the Trustee's efforts ...benefited the estate..."
which is nothing less than the diatremic opposite of the
truth. Every penny of that $453.055.03 was
"...collect(ed)..." by the "...debtor..." ..."...with
little or no help from ..." "...the Trustee's
efforts...".

Every penny of that sum came from the Debtor's (i.e.
my) motions, court appearances, extensive negotiations,
arbitrations, trials and verdicts etc. The Trustee did
nothing. Not one penny's worth of the $453,055.03 was

7

"...collect(ed)..." by the Trustee.  In fact, the Debtor respectfully submits that this Honorable Court need go no further than to this point in this Brief in deciding this appeal.  However, there is more.

Not only did the Trustee not produce one cent of the sum stated by the Court but he, in fact, committed one unnecessary act after the other in contravention of his basic Chapter 7 Trustee duties of acting in the best interest of the Estate and its Creditors which is amply explained in the Debtor's Declaration in Opposition (®   ).  With no condescension intended, your Debtor respectfully requests and beseeches that this  Honorable Court carefully read my Declaration in Opposition[1] to get a full feel of what has really occurred here. The harmful actions the Trustee took against the interests of the Estate and its Creditors[2] and the bizarre interpretation of the facts in the lower court Decision gives what the

---

[1]

[2] and incidentally, against the interests of hundreds of litigants in the Debtor's Plaintiffs' personal injury practice, which is owed much binding legal authority by all parties, the Courts and their officials, whether State or Federal (CITE) and continually ignored by the Trustee and the Debtor respectfully believes purposefully to his and his friends' financial benefit and the detriment of the Estate, Creditors, Debtor's personal injury Plaintiff and the Debtor himself.

8

Debtor believes is a 180 degree opposite of what has occurred in this bankruptcy, and especially the conduct and motivation of the Chapter 7 Trustee as well as a complete distortion of the Debtor's character and effort to run his practice as before, although emasculated by the Trustee for no discernable or stated reason, not to mention the Debtor's wholehearted attempts to comply with the Trustee's directives with no aid by the Trustee when requested of him, his attorney and other surrogates as a full and complete reading of my Declaration in Opposition ® ) and the Debtor's Designation of Record and Issues on Appeal ® ) are absolutely essential to an understanding of the completely unnecessary reign of terror visited upon your Declarant and this office.

Although duly (1) declared and (2) sworn-to, with the latter specifically under penalties of perjury, I hereby incorporate my (1) Declaration in Opposition and (2) Debtor's Designation of Record and Issues on Appeal ® )into *this* Declaration both under penalties of perjury, in an attempt to keep this Brief short, again, requesting that this Honorable Court refer to the appropriate

9

pagination in this Brief to the Declaration in Opposition, which details the facts and circumstances referred to herein without unnecessarily repeating same.

In an attempt to dispel the Trustee's attempt to paint your Declarant as the devil incarnate with the lower court's strange interpretations of many of the facts so as to lend false credence to me, I will briefly list various awards, accolades and positions, etc. in my career.

(1) High School

--   recipient of a yearly $1,000.00 Regent Scholarship monetary award for each of 4 years to be applied to College tuition.

--   Grades of 100, 100, and 93 on the three New York state-wide annual Regents Mathematics Final Year-end Examinations for (9th -11 or 10th -12) grades[3].

--   I was one of three students in the entire country accepted into the State University of New York, Buffalo University Center, to be trained by its entire

---

[3]The examination was only given for three out of four of the years in High School. I do not remember which.

well regarded faculty to supposedly become a world
renowned mathematician high school grade point average
was in the 90.

    (2) College

      Senior Class President

     --   Perfect 800 score out of a possible 800 on
the Graduate Mathematics Aptitude Test (A/K/A GMAT) taken
by those college graduates considering admission into a
post-graduate University tract for a Masters, Doctorate
or other appropriate post-graduate degrees.

     --   President Pro-Tempore of campus wide
undergraduate student government body involving virtually
all aspects of academic and social life, as well as the
allocation of $500,000.00 in state-mandated student
activities fees.

     --   Elected Senator for 3 years from dormitory
known as Mount College to the above student Senate.

     --   Assistant Treasurer of Faculty Student
Association running mostly all businesses on campus
jointly with faculty and administrators.

     --   creator and first Coordinator (i.e. head of)

11

the polity Hotline, a 24 hour campus help line for students in need of any type of help (e.g. academic, dormitory tenancy problems, psychological problems (e.g. potential depression and/or suicide call-ins)).

      -- assisted in creation of University's (i.e. State University of New York at Stony Brook) free student funded and run on-campus legal clinic with first participating attorney, Dennis R. Hurley, Sr. subsequently New York State Suffolk County Court Judge, then New York State Supreme Court Judge then United State District Court Judge For the Eastern District of New York.

    (3) Legal Career

      -- Administrative Law Judge - City of New York

      -- Arbitrator

      -- American Arbitration Association, Commercial Panel,

      -- Attorney-of-Record for the Plaintiff in the middle action of iconic triad of cases known as Pommels v Perez, cite; drafted motion papers and orally argued motion at *nisi prius* at Supreme Court; drafted all

appeals papers and orally argued appeal at the Appellate
Division, First Department and drafted all appeals papers
and orally argued appeal at the Court of Appeals in
Albany.

      -- Was Attorney-of-Record in the underlying
action of Woodson v Densby, 100 NY 2d 62, which is the
lawsuit which caused and created the necessity for
originally filing for Chapter 11 protection and then
later converted to Chapter 7 in this underlying
Bankruptcy action ...handled all aspects of Plaintiff's
personal injury actions for almost 30 years, including
initial sign-ups, having all forms drafted and filed,
initiating and filing all lawsuit documents, all
Discovery, thousands of court appearances, such as
arguing motions, conducting Framed Issue Trials and
Arbitrations appearing at Pre-Trial, Discovery,
Compliance and all other types of Court Conferences,
drafting collating and orally arguing 40 to 60 appeals in
every Appellate Court in the New York City metropolitan
area and some upstate.

    I have been called to help and represent other

13

attorneys in unusual matters where it looks, upon first glance, that they (1) may have exceeded the Statute of Limitations on a case or (2) one-time, when a relatively new judge conjured up an evanescent justification for threatening to hold the attorney in contempt of court and setting down a contempt hearing date.

In the former situation, I explained to the attorney, in a convoluted way, not necessary to delve into here, why the Statute of Limitation *had not even commenced* in this case but only if the attorney immediately took certain actions, which he did at my advice, which rectified the situation and literally "got him off the hook".[4]  In the latter situation, I represented the attorney at the faux contempt hearing and, after explaining to the judge a number of things, such as the contempt hearing that must be held *by another judge* and not that selfsame complaining judge; and that, in any event, I advised the Court why the attorney's conduct nowhere reached the level of Contempt

---

[4]The attorney was a close friend of Professor Siegel, who he could not reach at that moment and the attorney was then recommended by yet another mutual friend of the attorney to me.

14

of Court and, in fact, fit squarely at the level of admirably protecting her client's right. The judge immediately withdrew the Contempt Hearing Complaint.

Now, in very short order, it is necessary for your Declarant to explain to this Honorable Court the *real truth* of why we are here today. A few years after 1990, I obtained a 100% legitimate Default Judgment in the amount of millions of dollars on behalf of then five-year-old Infant, Zachary Woodson,[5] who was involved in an automobile accident while he was on the sidewalk when one of two vehicles which had just previously struck each other mounted the sidewalk, striking Zachary, causing him massive injuries including, but not limited to, broken bones throughout his body.

One of the two vehicles was a truck insured by American Transit Insurance Company (hereinafter "ANTIC") which had an avowed and stated policy of serving Answers in actions only for its insured and not its drivers, thereby resulting in the multi-million dollar *Default*

---

[5]And some $200,000.00 in lost of services for his mother, Tracy Woodson,.

15

Judgment after a *bench trial* on damages **with** participation by ATIC's lawyer(s) and no adequate timely appeal by them. The 30 day appellate deadline had elapsed, thereby supposedly ending the case.

ANTIC then paid all the monies owed of the Judgement under its policy to the Plaintiffs' counsel (i.e. the Declarant herein), who distributed all the funds to the infant, his mother, the trial counsel chosen by the Plaintiffs' Attorney-of-Record, costs and disbursements and virtually all of the Attorney-of-Record's, attorney's fees went to pay what he owed the Internal Revenue Service and the New York State Department of Taxation.

Long after the 30-day period to appeal supposedly ended the case forever, American Transit hired (1) Burton Roberts, (now deceased approximately one year) (2) with his law firm, Fishbein, Badillo, Harding & Wagner (as in the former state party chairman, New York City Mayor, New York City Deputy Mayor and I forgot the 4th) and (3) half the Plaintiffs' personal injury attorneys in the Bronx to make a motion to undo everything that has occurred on grounds never even attempted, much less succeeded, in the history

of the State of New York, and probably all other 49 States.

The motion by ANTIC was under Roberts' name, as he had just, I believe, within months earlier, retired as the Administrative Judge of the Bronx, the venue of everything that had transpired to that date. Prior to that, while still Administrative Judge, Roberts had frequent meetings with the Justices under his charge, including Justice Howard R. Silver, the judge who granted the Default Judgment, entered the multi-million Judgment and then undid everything and ordered the money returned for no good reason. He also denied Plaintiff's Cross-Motion to disqualify Roberts under Judiciary Law Section 17, which forbids Roberts from participating in a case as an attorney when previously participated in that same case when he was a judge, as proven by documents obtained by ANTIC through Discovery.

During the pendency of the motion and Cross-Motion (adjournments, and deliberation time, while they were submitted and *sub judice*) Roberts admitted visiting Justice Silver in the latter ex-parte Chambers two through three times each week, discussing the case and the motions (and

17

Cross-Motion) and committed other improper, illegal and grossly unethical acts.

Needless to say, the Court (Silver, J.) undid everything and ordered the million of dollars returned against all New York State law. The Appellate Division, First Department, affirmed yet granted the Woodson(s) leave to appeal to the Court of Appeals in Albany. However, that *would* not stop ATIC from executing on the judgment and coming into my office and selling everything in sight. I, therefore, had to file a Petition for Chapter 11 protection in the Southern District, Bankruptcy Court which afforded me the automatic Bankruptcy Stay on the ATIC/Woodson Judgment so as to give me and the Woodson(s) the proverbial "breathing space" to appeal the lower court's Decision to the Court of Appeals in Albany.

The *only* reason for my filing for Chapter 11 Bankruptcy Protection was to obtain the automatic Bankruptcy Stay from the ATIC judgment while I appealed to the New York State Court of Appeals. Plaintiff's personal injury practice's were otherwise not by any mean in direr financial circumstances needing Federal Bankruptcy

Protection in any way.

The case was assigned to the Honorable Judge Cornelius Blackshear who scheduled the very first Conference in this case. My then attorney, Martin Ochs, Esq., appeared at the Conference advising that my attendance was unnecessary. After the Conference he relayed to me that he met Lance Gotko, Esq., of the law firm of Friedman, Kaplan and Seiler, Esq., attorney(s) for ATIC who were at the center of the perhaps dozens of attorneys representing ATIC coordinating both the State and Federal proceeding who told Mr. Ochs that it was American Transit orders to "take my license", and gave them a blank check to do so.[6] ATIC through counsel Gotko immediately began an onslaught of Discovery Demands, of my office that, although they were technically entitled to, as a matter of Discovery, was specifically designed to harass me and my staff as they requested copies of every check that I ever wrote, both personal and business; every Summons and Complaint ever drafted and on and on and on and on, seemingly copies of

---

[6]This is due to my obtaining dozens of Default Judgments and prevailing in Summary Judgment Motion against all the carriers in my Plaintiff's automobile cases where Defendants carriers do not serve Answers for their Clients.

everything ever produced in my office my staff with this massive additional undertaking to their already full workload, my very loyal staff, for which I will always be very grateful bucked up and performed more than admirably for which I will be eternally grateful.

Eventually, the State Court of Appeals process wended its way to completion and the Woodson(s) and I won the case in the New York State Court of Appeals which reversed Justice Silver's Order for us to give all the money back which was the original and *only* reason for filing the original Bankruptcy Petition some one to two years earlier. <u>Woodson v Densby</u>, supra.

However, as stated, although the staff hung together during the arduous and tortuous State appeals practice, it took a toll on them, on me and, to a lesser extent on the finances of the office as we spent less time processing the cases (thereby taking in somewhat less fees) as we were complying with ATIC Discovery as best we could, complied with other requirement *by the court* and I personally had to attend many (and I believe all) subsequent bankruptcy court appearances, conferences with Mr. Ochs' in his office

and, of course, numerous phone call with him.  Before winning Woodson, supra, in New York High Court, Judge Blackshear gave me, with consent of all the parties, adjournments of the Conferences awaiting the Decision on the Appeal and further adjournments after the favorable Decision on the Appeal, recognizing that, as a result of the State High Court Decision, ATIC was no longer a party to the Bankruptcy action and that while much emphasis had to be placed by my staff in the previous one to two years on bankruptcy concerns (i.e. Discovery to ATIC) that ceased dead in its tracks a toll, though clearly not insurmountable, was taken on the finances of the office that needed to be spackled through further post-Woodson Conference adjournments granted by Judge Blackshear, again at the would-be consent of the remaining parties to the action.  Hopefully, given some additional time and the second Woodson lawsuit coming up soon (cr)) I could have withdrawn from the bankruptcy with leave of the Court.

Judge Blackshear retired from the bench. He was replaced by the Honorable Judge Stuart M. Bernstein who also adjourned the Conferences at the recommendation of the

parties. After a number of Conferences, a representative
of the New York State Tax Department appeared at a
Conference for the very first time although on notice of
the filing of the original Petition and I believe the dates
of the further Conferences and Motions. Although explained
to her on the side the history of this action and that the
second Woodson lawsuit was eminent in New York State
Supreme Court, which would "clean everything up" she was
the lone party at this hearing to refuse consent to an
adjournment. Judge Bernstein then converted this Estate
and proceeding to a Chapter 7 Bankruptcy, specifying at
that (conversion) hearing[7] that the purpose of the
conversion was to have the Trustee (to be appointed)
generally independently verify what the parties have been
telling him about the Woodson case, its affect on the
Bankruptcy Hearing and the general imminency of the second
Woodson trial its chance of success (very high) and the
general approximation of attorney(s) fees to go to the

---

[7] I was present at all of the Court hearing and Motion with my attorney(s) and all of the
dozens of Conferences and hearings with the exception of approximately two appearances, one
for illness and another for a critical appearance in State Court on one of my Plaintiff's personal
injury action.

Woodsons' lawyer from that trial so as to confirm whether the Debtor will then be able to then outright withdraw from bankruptcy or at least, set-up a relatively simple schedule for withdrawing.

Within a few days, Robert Geltzer was appointed the Chapter 7 Trustee over the Estate. I received a telephone call from Robert Wolf, Esq., who identified himself as counsel to Trustee Geltzer in this Chapter 7 matter. He asked a few general questions and asked me the name and telephone number of my trial counsel for the second Woodson case[8]. I complied and later received a phone call from my trial counsel who confirmed that he spoke to Mr. Wolf, who wished to know in general about the second Woodson case, and he confirmed, as I recall, and relayed back to Mr. Wolf that, pursuant to rules of the Honorable Justice Herman Cahn, Supreme Court, New York County, IAS Part 62, in the COMMERCIAL PART, which is designed to handle complicated multi-million dollar commercial cases, that he is close to deciding Cross-Summary Judgment Motions and then, depending

---

[8]The difference between the first and second Woodson cases at (R   )

upon their results the trial will be immediately --- after, thereby confirming what I said to Judge Blackshear.

Therefore, my counsel explained to Mr. Wolf that it was in the best interest of all concerned (i.e. the Estate, the Creditors, the Court, the parties, etc.,) that the Trustee just wait a short period of time for the second Woodson case to be resolved which my trial counsel estimated to Mr. Wolf to be worth at considerable sum of money.

Against all interest of the Estate and its Creditors, as soon as, counselor Wolf confirmed that a substantial sum of money would almost certainly and shortly come into the practice through the Second Woodson case rather than waiting a short period of time so that this Bankruptcy could end or, at the very least, the Creditors substantially pay with a minor payment schedule approved by the Court[9], and then simultaneously the bankruptcy ends; Trustee Geltzer saw this as an opportunity to directly raid the Debtor's personal injury practice and thereby

_____

[9]Keep in mind this was when Geltzer was just appointed as the Chapter 7 Trustee in 2006.

24

indirectly wondering the hundreds of cases therein.

He and his cohorts <u>immediately</u> figuratively and completely unnecessarily spent funds like a drunken sailor while doing absolutely nothing to aid the Estate and, in fact, grievously harming the personal injury practice which no longer exists.

He immediately, without ever, to this date, providing any explanation completely stopped paying my approximately seven to eight staff members which continued for 5-6 weeks, my intensely loyal and extremely talented paralegal(s) and other staff members did not resign and continued working and were not paid for that 5-6 weeks period and their salaries only commenced after that 5-6 weeks period without the back pay[10].

Geltzer then in the stealth of the early evening, after business hours, broke down the locks, and changing the lock to my office and placed a sign that stated "Law Office of Robert Geltzer. He then told my Office Manager,

---

[10] Until almost six years later when I notified the Bankruptcy Court in the underlying Motion which is the subject of this Appeal (R   ) that Geltzer failure to pay them (sufficient funds in my (then former) account was <u>never</u> an issue) was a violation of the United States Constitution provision(s) against slavery no less.

who was working late that the office would be closed on Monday and to notify all staff not to come in because he was having his people come in to go through files in direct violation of, Attorney-Client Privileges and confidences with three to four hundred violation, one for each file, which, incidentally, affected all previously planned appointments, court appearances, and phone calls not just for Monday and Tuesday cover but for appointments and phone calls on Sunday a regular working day for the office.

An Order to Show Cause by my second and present counsel, David Schrader of Schrader & Schoenberg, that weekend on Sunday after he did reach the Trustee's counsel, Robert Wolf, to notify him that if they did not provide access on Sunday to me and my Office Manager to obtain all files for court appearances on Monday and Tuesday and to cancel any Sunday, Monday and Tuesday appointments that Schrader would file a Complaint with the Disciplinary Committee, the Bar Association, the Police Department and any other appropriate authorities.

Needless to say, we were gain access to the office to obtain the files on Sunday and transported them to

Schrader's office to work on them on Monday (one appeal for me to argue and 6 oral argument on Motions in the same courthouse, Judge and part) and to aid counselor Schrader and his partner Schoenberg who were working in their office on the previously mentioned Order to Show Cause which was returnable before the Honorable Judge Stuart Bernstein.

Needless to say, the next day as soon as he had heard what happened the Court (Bernstein, J.) immediately turned to Trustee's counsel and told him to give my counsel the new keys as is hornbook law, that the Attorney-Client-Privilege belongs to the client not the attorney and, therefore, Trustee Geltzer does not in any way shape or form "stand in my shoes and just, as he did, just "take over the practice Baker v Dorfin, 232 F.3d 121 (United States Court of Appeal for the Second Circuit, 2000). Another great morale builder for the staff.

Again, the next attempt by this errant Trustee was the refusal to pay the usual and customary bills in any law or general practice first and foremost, he failed to pay the long standing monthly Health Bill for the staff, again with no explanation or justification or problems with funds that

27

I knew of, in addition, he ceased paying our process server company monthly bills causing them to cancel service for us, again with no written or oral justification or reason, an absolute prerequisite for the continuation of the law practice.  When a trial came up and the expert testimony bill of a Chiropractor was forwarded to him, again it was ignored, in fact, no bill were paid at all except the building rent, the phone service and one or two other minor bills each month.

The staff was demoralized could not continue without Health Insurance which this office had until that time, I believe, for fifteen years, they knew absolute crucial importance of sending various papers to process server which they could no longer do and they slowly reluctantly and unfortunately left my office after, for some, long tenures for other jobs.

Instead of waiting a short period of time upon his appointment for me to obtain the Second Woodson case attorney fees, instead Trustee Geltzer refuse to do so, instead seeing an easy sucker mark and spending every penny unnecessarily, which they expect to have approved now.

28

They first had the unmitigated gall to change the locks
without any permission or authority from the Court or
warning to Debtor's counsel when they, fortunately,
expected the *entire* staff to be gone for the weekend to
just put a sign stating the "Law Office of Robert Geltzer":
When the Court slapped him down on that he never paid the
staff from his inception of appointment as Trustee for 5-6
weeks with no warning explanation, justification or
indication of when they would be paid.  And the rest of
this goes on and on and on forcing the staff to be whittled
down from 7-8 to 3 with only one having any real
experience.

   Mr. Geltzer when the Woodson money came in "made me an
office I could not refuse" by having me agree that the
multi-hundred thousand successfully completed and settled
second Woodson case attorney(s) fees going into my practice
be placed into a separate escrow account not to be used by
anyone until the future (undated. i.e. now in exchange for
my obtaining some of my former authority in the practice,
thereby assuring that no matter what happens in the future
Geltzer and his cronies would eventually get their fees

paid, including the fees for seeming myriad(s) of illegal activities, such as the bashing of the locks and changing of the keys and then losing the Motion pertaining to that and, yet, in this bizarre world they get paid for their actions and motions, win or loose in this case, loose for grossly illegal activities. And who pays? The Debtor's Estate in the Motion below unless this Court sees through this self-help scam.

Regarding, any and all Complaints listed in the Decision of the Court now upon appeal regarding the supposed failure of Your Honor's Debtor to file certain bankruptcy forms, all I can say is that a robust successful highly complicated Plaintiff's negligence practice with hundreds of files and a deservedly proud staff, which would never had left me if it had not been for the action of Geltzer reduce down to three employees could hardly keep up with the cases anymore, relying on a plethora of adjournments of Motion, Conferences and the like to avoid missing deadlines[11].

---

[11]And even those adjournments costs additional unnecessary per-diem fees to outside attorneys.

After unnecessarily reducing my staff to 3 to make unnecessary busy work for himself and friends with no aid whatsoever to the Debtor, the Debtor's counsel, or the Debtor's Estate with the personal injury practice, no one took into consideration that the multi-Hundred of Thousand of Dollars placed in a special escrow account for the sole true purpose of insuring that they will be paid for unnecessary actions, illegal actions, etc.; this does not even take into consideration the loss of access by my practice to the multi-Hundred of Thousand of Dollars in the Second Woodson case that rightfully could have and should have been used by the Debtor in furthering that practice, moving it forward and hastening the pace of the cases, and the garnering of the attorney fees.

Not once can I think of either Trustee Mr. Geltzer, counselor Wolf, the Trustee's accountant, Plotzker or anyone else aiding the Debtor in any way or even answering the Debtor simple question which was e-mailed on numerous occasions as to whether or I should or even am allowed to file taxes in that once I filed for bankruptcy, I was no longer a legal entity and Geltzer became that entity and

neither I nor my attorney knows whether I am even permitted
to pay taxes when asked of Wolf's associated twice by
e-mail, to date there is no answer.

When asked in front of Judge Bernstein when my office
was in the process of closing as to whether the Trustee
holding all of that money would pay to continue servicing
my main phone line he, actually had the unmitigated gall
to state in front of the judge that I have to point out to
him in the legal books where it requires them to do so.
Mr. Wolf makes much a deal of Disciplinary Complaint
against me as this has always been the norm, in fact, I had
been deposed about 7 or 8 of clients complaints, generally
on older Complaint that predated the bankruptcy filing
complaining that their case was taking too long and each
and every deposition found nothing committed by me such as
one case taking 8 years because a case started in Supreme
Court was transferred to down civil Court then transferred
to Supreme Court with the third party defendant fighting
for years over a Discovery matter for years.  It was only
when  Geltzer emasculated my staff down to 3 that I was
caught behind in responding to some Complaints and, other

32

Complaints were filed after I closed my office after disbarment and the closure of the office and although Change of Address forms were filed the Post Office apparently mis-handled the matter as the Post Office where I live is constantly written up for decades by either the Daily News or the Post as the worst Post Office in the County.

Finally, while Mr. Schrader has graciously and did in fact, volunteer to represent me gratis at a number of the Disciplinary Committee Depositions, all limited to individual client Complaint and all of which I believe were dismissed but none of which is there. A hint of anything incorrect my me, eventually Mr. Schrader could no longer represent me which I fully understood. The tax on the resources of his practice[12].

I then proceeded to a Disciplinary Committee Deposition, where, to my surprise, they did <u>not</u> question me about any compliance but had something that looked like

---

[12]He still represents me on the bankruptcy. I am Pro-Se on the appeal.

a spreadsheet [13].   It had apparently been prepared over a

period of months prior to the deposition by an individual

who was present at that deposition, who was apparently an

accountant or bookkeeper either on staff or hired by the

Disciplinary Committee for that specific purpose and who

was sitting next to the Disciplinary Committee staffer who

had been assigned to and was the previous questioner of me

on the prior date of the depositions, which, unlike that

day were limited to complaints.

    She (  ) apparently knew about as much of the hundred

of pages of spreadsheets that I knew because he was

beginning to point to them and whisper to her as she

started questioning me and, for all I know, may have known

more as she may have been prepared for days or weeks prior

to that deposition.  As far as I am concerned looking at

those spreadsheet was the equivalent to me of attempting

to speak a foreign language that I knew not one wit.  While

initially I felt that as an attorney then, having done

hundreds of depositions I could represent myself once we

---

[13]As stated above I have a tremendous knowledge and aptitude of mathematic in
theoretical and applied mathematic.  I know nothing of accounting or bookkeeping.

started and the "spreadsheets" if that, in fact, was what they were, I then came to the conclusion that, not having seen these documents however termed, prior to the deposition that I needed both an attorney and an accountant to represent me prior to that deposition and to be provided with a copy of that document sufficiently in advance of any questioned. I objected and asked for a new date. They said no. I based the objection on my right to an attorney under the circumstances, under the Constitution and the right to a accountant. The request/demand was denied.

(R   ) I have been advised by both my attorneys in this bankruptcy that an individual in bankruptcy is forbidden to hirer professionals for himself, that professionals include attorneys and accountants. I then received a Motion to be  suspended and then a subsequent Motion to be disbarred which I was forced to respond to Pro-Se although I have no experience in the area of professional responsibility and I was disbarred.

I say to this Court, under penalties of perjury that in all the years that I have been an attorney I have never lied to a Court and have always adhered to the highest

35

standards possible.  There are certain things beyond ones
control, no mater how knowledgeable or powerful one is that
can adversely affect your life.  Some people unexpectedly
get life threatening and life ending diseases completely
unexpectedly and some people get Trustees like Mr. Geltzer.
I am fully aware, having done 40-60 appeals in the State
Court that Appellate Brief and even Motions should not be
written even in part, in the first person narrative, as
this has been done by Your Honor's Debtor and this I
believe for the first time that I have done so in an
Appeal, but when one files for bankruptcy not because a
generalize downturn in financial fortune but for one
specific case that I believe was "fixed" by American
Transit with the Court of Appeals reversing the lower Court
Judge 6-0 unanimous  vote and what was relayed to me by my
trial counsel was laughter and derision by the spectators
toward the ATIC lawyer orally arguing the appeal as it was
apparently obvious what was going on; I am, with apologies
to this Honorable Court am writing this Appellate Brief,
with perhaps a bit much alacrity as my life has essentially
been destroyed by this entire matter. Health wise and

36

monetary wise as American Transit lawyer has already stated
in this Brief, has admitted my first lawyer, Martin Ochs,
Esq. , that their many employees is (1)to take his license
and (2) ATIC lawyer when asked by the Honorable Judge
Blackshear in Court as to how much in attorney fees had
ATIC spent to date  in their various actions against me and
my clients (the Judge asked them at sometime prior to 2004)
he responded  with an amount to the effect of One to Two
Million Dollars with the emphasis on Two Million Dollars.
As to Geltzer  with his activities, while not motivated by
any antagonism or hostility towards me, was 100% monetarily
motivated, was completely unnecessary for when he was
appointed his counsel, Mr. Wolf, confirmed with me an my
trial counsel that the second Woodson case would be over
with very shortly and it was extremely likely, if not
certain, that I would receive attorneys fees in the hundred
of thousands of dollars.  Instead of waiting, in the best
interest of the Estate they saw that as a great opportunity
"pluck a chicken" and I believe a great practice and a
great life  into      .

37

His actions turned my staff into a sum (3) inadequate to the task.  It turned a great place to work into wholly he' '.  Long time staff left, I could not keep up with the previous speed on the resolution of cases.  It was impossible to fill out every single bankruptcy form making me late on many of them.  I received absolutely no help from Trustee Geltzer, his lawyer or accountant when either I or my lawyer ask.  Isn't that their job?  They, in fact, took every to make it impossible for me to continue doing large time consuming practice to begin with added to all these additional forms and responsibility subtracting all efforts by them to make my life and occupy my time with nonsense by their affirmatively producing a barebones staff from 7-8 to 3.

I again ask this Court, to please read my Declaration in Opposition, cull some of the vitriol, even some of it is repetitive to this Brief to get a full feel of what Trustee Geltzer did which, I believe, under the law, is to aid the Estate and Creditors (if determined at the beginning it was hopeless to close it down immediately) that was not the case.  I also apologize for typographical

grammatical and pagination errors in this brief as I am in the middle of the last day to file it.

Wherefore, it is respectfully submitted that the Trustee's and his associated cohorts' Fee Application be denied in its entirety together with such other further and different relief as to this Appellate Court may deem just and proper, together with cost and disbursements of same.

Respectfully submitted,

Dated: March 16, 2019
New York, New York

B. Sil; Pro-Se (7319)
Barry Siskin, Pro-Se
c/o Schrader & Schoenberg
711 Third Avenue
Suite 1803
New York, NY 10017


Robert Wolf, Esq.,
c/o Squire & Sanders
30 Rockefeller Plaza
23rd Floor
New York, NY 10112
By Fax to (212) 872-9815


Trustee Robert Geltzer
1556 Third Avenue
Suite 505
New York, NY 10128

10/13/2011    10:30 著者 者                                    (FAX)                    P.002/016

02-10373-smb   Doc 349   File   0/13/11   Entered 10/13/11 15:55:38   Main Document
                                    Pg 1 of 16

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------X
In re:                                  :
                                        :
          BARRY SISKIN,                 :       Chapter 7
                                        :       Case No. 02-10373(SMB)
                                        :
               Debtor.                  :
-------------------------------------------------X

## MEMORANDUM DECISION AND ORDER OVERRULING
## DEBTOR'S OBJECTION TO PROFESSIONAL COMPENSATION

**APPEARANCES:**

BARRY SISKIN
Debtor
108-23 64th Avenue
Forest Hills, NY 11375

SCHRADER & SCHOENBERG, LLP
Attorneys for Debtor
420 Lexington Avenue, Suite 628
New York, NY 10170

          David A. Schrader, Esq.
               Of Counsel

ROBERT L. GELTZER, ESQ.
Trustee
1556 Third Avenue, Suite 505
New York, NY 10128

SQUIRE, SANDERS & DEMPSEY (US) LLP
Attorneys for Trustee
30 Rockefeller Plaza, 23rd Floor
New York, NY 10112

          Robert A. Wolf, Esq.
          Andrea K. Fisher, Esq.
               Of Counsel

BRYAN CAVE LLP
Former Attorneys for Trustee
1290 Avenue of the Americas
New York, NY 10104

        Thomas J. Schell, Esq.
        Carolyn K. Brooks Rincon, Esq.
           Of Counsel

DAVIS, GRABER, PLOTZKER & WARD, LLP
Accountants for the Trustee
150 East 58th Street
New York, NY 10155

UNITED STATES TRUSTEE
33 Whitehall Street, 21st Floor
New York, NY 10004

NANCY RODRIGUEZ
Objecting Creditor *Pro se*
31 Leonard Street, Apt. 8A
Brooklyn, NY 11206

BRIAN K. YOUNG
Objecting Creditor *Pro se*
447 Kingsborough 4th walk, Apt. 9H
Brooklyn, NY 11233

THOMAS E. WOJTASZEK
Objecting Creditor *Pro se*
695 Union Street, Apt. 2L
Brooklyn, NY 11215

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

        The chapter 7 trustee filed his Final Report and request for commissions in this nearly

ten-year old case, (*see Trustee's Final Report*, dated May 12, 2011(ECF Doc. # 329)), and his

professionals filed their final applications for compensation and reimbursement of expenses.

(*See Application of Squire, Sanders & Dempsey L.L.P. Under 11 U.S.C. §§ 330 & 331 for First*

*and Final Allowance of Fees and Reimbursement of Expenses Incurred as Substitute Counsel to*

<div align="center">2</div>

*the Chapter 7 Trustee from August 11, 2008 Through October 13, 2010 and Related Relief,* dated
Apr. 21, 2011 (ECF Doc. # 333); *Affidavit of Andrew W. Plotzker in Support of Application of
Davis, Graber, Plotzker & Ward, LLP for Approval of First and Final Allowance of
Compensation and Reimbursement of Expenses as Accountants to the Chapter 7 Trustee,* sworn
to Feb. 23, 2011 (ECF Doc. # 334); *Application of Bryan Cave LLP Under 11 U.S.C. §§ 330 and
331 for First and Final Allowance of Fees and Reimbursement of Expenses Incurred as General
Counsel to the Chapter 7 Trustee from January 31, 2006 Through August 12, 2008 and Related
Relief,* dated Apr. 25, 2011 (ECF Doc. # 335).)

The debtor, a disbarred lawyer, filed an objection to the fee requests, (*See Declaration in
Opposition,* undated and filed on Sept. 6, 2011 ("*Siskin Declaration*") (ECF Doc. # 346)), and
Nancy Rodriguez, Brian Young and Thomas Wojtaszek, three former employees of the debtor,
filed objections to the Final Report. (*See* ECF Doc. ## 342, 343, 344.)

For the reasons that follow, the debtor's objections are overruled, and the resolution of
the objections to the Final Report will be resolved following a further hearing.

## BACKGROUND

### A.  Introduction

The debtor, a personal injury attorney on the petition date, filed a chapter 11 case on
January 28, 2002. His case highlights the problems relating to the allocation of professional fees
between the estate and the debtor, and merits brief mention at the outset. Property of the estate
does not include "earnings from services performed by an individual debtor after the
commencement of the case." 11 U.S.C. § 541(a)(6). When this case was commenced, this rule
applied in individual chapter 11 cases, and hence, an individual chapter 11 debtor's post-petition

3

earnings were not property of the estate.[1]  Thus, the fees and receivables attributable to pre-petition services are property of the estate, while the fees and receivables attributable to post-petition services are not.

The rule, easily stated, is nonetheless difficult to apply.  At the time of the commencement of the chapter 11 case, a professional debtor typically has the right to fees (i.e., receivables) based upon services rendered pre-petition which are eventually collected post-petition.  Furthermore, the commencement of the case does not affect the debtor's right to practice his profession, and he will continue to generate new receivables and collect fees, even on pre-petition matters, that are solely attributable to post-petition services.  The challenge is to determine which fees and receivables belong to the estate and which belong to the debtor free of the claims of his pre-petition creditors.

The challenge is less daunting when the professional debtor maintains adequate records that identify the services performed and expenses incurred by the debtor pre-petition and post-petition.  Regrettably, the debtor in this case failed to maintain those records, or refused to produce them, and this set the stage for the extensive litigation and substantial professional fees to which he objects.

**B.      American Transit Insurance Company ("American Transit")**

Ironically, the debtor's travails can be traced to his successful prosecution of a lawsuit.  Prior to the commencement of his chapter 11 case, the debtor had obtained a judgment in the sum of $4.17 million on behalf of his client, an injured pedestrian, in a matter entitled *Woodson*

---

[1]      The 2005 BAPCPA amendments to the Bankruptcy Code changed this rule.  Under § 1115(a)(2), property of the estate includes "earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted."

4

v. *Mendon Leasing Corp.* ("*Woodson*"). The driver of one of the vehicles involved in the

accident defaulted, and American Transit, the driver's insurer, paid the policy limits of

approximately $2.9 million. From this amount, the debtor received a fee of $1 million. In

addition, the state court appointed the plaintiff as the driver's receiver to sue American Transit

for additional damages based on American Transit's breach of the insurance contract.

Unfortunately for the debtor, the judgment was subsequently vacated, the trial court

ordered restitution, and the Appellate Division affirmed. *Woodson*, 743 N.Y.S.2d 443 (N.Y.

App. Div. 2001). The debtor's obligation to make restitution apparently drove him into

bankruptcy and pitted him against American Transit, his largest creditor. American Transit

became actively involved in the case, and attempted to obtain discovery relating to the debtor's

financial situation.

The debtor's problems relating to the inadequate disclosure of his financial affairs began

here. American Transit obtained a series of orders compelling the debtor to produce

documentation or give testimony, and after the first order, the subsequent orders often sought the

production of the information commanded by the earlier ones. (*See Order: (I) Directing Debtor

to Appear for Examination Pursuant to Federal Rule of Bankruptcy Procedure 2004, (II)

Directing the Debtor to Produce Documents, and (III) Granting Creditor Leave to Serve

Interrogatories*, dated Aug. 14, 2002 (ECF Doc. # 27); *Order Compelling Discovery*, dated Oct.

4, 2002 (ECF Doc. # 52); *Order*, dated Oct. 4, 2002 (ECF Doc. # 53); *Order (A) Directing

Debtor to Produce Documents and Answer Interrogatory, and (B) Scheduling Compliance

Conference*, dated Dec. 13, 2002 (ECF Doc. # 90); *Order (A) Directing Debtor to Produce

Documents, Execute and Affirm an Affidavit, (B) Answer Interrogatory; (C) Scheduling a Motion

for Sanctions; and (D) Denying Stay Pending Appeal*, dated Jan. 29, 2003 (ECF Doc. # 97).)

The debtor's noncompliance with the Court's directions culminated in a $72,000 sanction award in favor of American Transit. (*Order (A) Imposing Monetary Discovery Sanction, (B) Directing Further Discovery Compliance, and (C) Scheduling Compliance Conference*, dated Mar. 13, 2003 (ECF Doc. # 111).) The order granting the sanction recited the history of the debtor's "delaying tactics," which it characterized as unreasonable, vexatious, undertaken in bad faith, prejudicial and unacceptable:

> [A] substantial, compensatory monetary sanction is appropriate, having determined that (1) the Debtor's various delaying tactics, and his unreasonable and vexatious multiplication of proceedings herein, were undertaken in bad faith, (2) the Court and ATIC [American Transit] were significantly prejudiced as a result of the Debtor's eight-month refusal to timely comply with his discovery obligations, (3) the sound administration of justice makes it important to deter the kind of unacceptable behavior engaged in by the Debtor, and (4) in light of the Court's repeated warnings that a sanction would be imposed, which warnings were ignored by the Debtor, lesser sanctions would not be effective.

C.   **The Conversion Motion**

The debtor was not having any greater success prosecuting his case. On or about February 28, 2003, the United States Trustee moved, in the alternative, to convert or dismiss the case based upon the lack of progress in the case, the debtor's failure to comply with orders of the Court directing him to provide information to American Transit, his failure to file operating reports in accordance with the United States Trustee's Operating Guidelines, and his failure to pay United States Trustee quarterly fees for the fourth quarter of 2002. (*See Application of the United States Trustee to Convert this Chapter 11 Case to a Chapter 7 Case or, in the Alternative, to Dismiss this Chapter 11 Case*, dated Feb. 28, 2003 (ECF Doc. # 101).) The motion remained pending while the debtor and American Transit continued to fight.

On or about December 7, 2004, the United States of America filed its own motion, seeking to convert or dismiss the case based upon the debtor's failure to file individual tax

6

returns for the years 1998 through 2003, and asserted substantial claims for unpaid pre-petition and post-petition federal FICA, FUTA, and individual income taxes. (*See Declaration of Paul de la Vega*, dated Dec. 2, 2004 (ECF Doc. # 145).) The United States Trustee, whose own motion was still pending, filed a statement in support of the Government's motion. (*Statement in Further Support of the Motions to Convert this Chapter 11 Case to a Chapter 7 Case or, in the Alternative, to Dismiss this Chapter 11 Case*, dated Jan. 19, 2005 (ECF Doc. # 150).) The debtor's original bankruptcy counsel, Ochs & Goldberg, LLP, also supported the motion, (*see Statement in Response to Motion Convert [sic] Chapter 11 Case to a Chapter 7 Case or, in the Alternative, to Dismiss Chapter 11 Case*, dated Jan. 21, 2005 (ECF Doc. # 151)), as did New York State. The State's supporting affirmation asserted that in addition to the debtor's failure to file a plan and disclosure statement and confirm a plan in nearly three years, the debtor had failed to file and pay post-petition withholding taxes in the aggregate amount of approximately $38,000. (*Affidavit [of Deborah Dwyer] in Support of Motion to Convert or Dismiss*, dated Dec. 23, 2005 (ECF Doc. # 189).)

The Government withdrew its motion after the debtor filed his past due federal income tax returns, (*Notice of Withdrawal of Internal Revenue Service's Motion to Dismiss this Chapter 11 Bankruptcy or, in the Alternative, to Convert it to a Chapter 7*, dated Jan. 18, 2006 (ECF Doc. # 190)), but the United States Trustee and New York State continued to press the United States Trustee's motion. At a hearing held on January 26, 2006,[2] the State argued that the debtor still owed approximately $39,000 in connection with unpaid withholding taxes for his employees (the debtor had filed returns but not paid the tax), and had failed to file any withholding tax returns

---

[2]   The case was originally assigned to Bankruptcy Judge Cornelius Blackshear. Following his retirement, the case was reassigned to me.

after September 2003. (Transcript of the hearing held Jan. 26, 2006 ("Tr."), at 3–4 (ECF Doc. #
212).) The United States Trustee added that the debtor was late and/or delinquent in filing his
operating reports. (Tr. at 4–5.) The debtor's counsel did not dispute any of the charges. (See Tr.
at 5–6.)

As a result, the Court granted the motion to convert at the end of the hearing. By now,
the case was four years old with no progress toward a successful conclusion. The debtor had
failed to pay administrative expenses (i.e., taxes) causing substantial prejudice to the estate and
was a "serial late filer" of tax returns and operating reports. (Tr. at 11.) In addition, there
appeared to be a substantial pre-petition receivable that could be used to pay the debtor's
creditors. (Tr. at 12.) The Court signed the conversion order that same day, (Order Converting
Chapter 11 Case to a Case Under Chapter 7, dated Jan. 26, 2006 (ECF Doc. # 193)), and the
United States Trustee appointed Robert Geltzer to serve as the case trustee (the "Trustee").
Geltzer retained Bryan Cave LLP ("Bryan Cave") to represent him as his counsel and Davis,
Graber, Plotzker & Ward, LLP ("Davis Graber") as his accountants. Squire, Sanders &
Dempsey L.L.P. ("Squire Sanders") eventually replaced Bryan Cave, and Bryan Cave, Squire
Sanders and Davis Graber are the three final fee applicants along with the Trustee.

D.    Post-Conversion Events

The debtor's failure to provide adequate disclosure to American Transit and the United
States Trustee continued post-petition, but the conversion and appointment of the Trustee
presented him with a bigger problem. Heretofore, the debtor continued to practice law from his
office and collect fees without outside interference. While the conversion did not affect the
debtor's ability to practice law or his relationship with his clients, he now had to account to the
Trustee for his open matters and fees so that the Trustee could determine whether the fees

8

belonged to the estate (*i.e.*, they were earned pre-petition) or to the debtor (*i.e.*, they were earned post petition). In particular, the New York Court of Appeals had reversed the order vacating the judgment in the *Woodson* matter, and reinstated the judgment. *Woodson*, 790 N.E.2d 1156 (N.Y 2003). Since Woodson had sued American Transit as the driver's receiver for breach of contract, the reversal opened up the possibility that the debtor might be due a substantial pre-petition fee.

Consequently, the Trustee had to determine the portion of the fees that the debtor had collected during the prior four years that belonged to the estate, ascertain the portion of future fees allocable to services rendered prior to the petition date, and more immediately, safeguard the property of the estate, including its books and records. Toward that end, the Trustee did what every chapter 7 trustee does immediately upon his appointment; he changed the locks on the doors to the debtor's office to preserve the property and records. This exacerbated the tension between the Trustee and the debtor, who was trying to carry on a law practice from that office, and needed access to his files.

While this crisis was eventually resolved and the debtor was readmitted to the premises, he could not avoid the presence of the Trustee and the Trustee's representatives in his office who needed to review his files and question his employees. The debtor had identified more than 440 pending cases in his inventory but the status and potential value of these cases was not apparent. (*See Affirmation in Support of Trustee's Motion for Order Pursuant to 11 U.S.C. § 327 and Federal Rule of Bankruptcy Procedure 2014 Authorizing Retention of Sheldon Tashman, Esq., George Statfeld, Esq., and Anne-Marie McClean, Esq., as Evaluators to the Trustee*, dated Mar. 6, 2006, at ¶ 4 (ECF Doc. # 215).) To assist him, the Trustee hired three personal injury lawyers to evaluate the worth of the pending cases to the estate, and obtained an order authorizing him to operate the debtor's business for 90 days so that he could pay those employees he needed to

9

complete his work. *(See Order Pursuant to 11 U.S.C. § 721 Authorizing the Continued*

*Operation of the Debtor's Business for Limited Period*, dated Mar. 29, 2006 (ECF Doc. # 231).)

When the debtor's cooperation was not forthcoming, the Trustee, like American Transit,

had to obtain an order compelling the debtor to produce documents and provide information.

*(See Order Authorizing Trustee's Examination of the Debtor Barry Siskin and Directing*

*Production of Documents Pursuant to Bankr. R. Proc. 2004*, Mar. 27, 2006 (ECF Doc. # 229).)

The parties subsequently entered into a stipulation under which the debtor agreed, *inter alia*, to

provide certain case specific information relating to the debtor's inventory and file monthly

accountings of the fees. *(Stipulation and Order Pertaining to Agreement Between Robert L.*

*Geltzer as Chapter 7 Trustee and the Debtor Barry Siskin*, dated July 19, 2006 (ECF Doc. #

254).)

Despite this apparent truce, the parties continued to fight over the debtor's production of

information. In time, the Trustee obtained an order to show cause regarding the debtor's

continuing failure to file the monthly accountings or produce documents and information he had

previously been directed to produce. *(Order to Show Cause Regarding Trustee's Motion to*

*Compel Debtor's Compliance with Prior Orders of this Court and for Additional Relief*, dated

July 16, 2009 (ECF Doc. # 10, filed in Adv. Proc. No. 08-1381).) Pending the hearing and

determination of that motion, the debtor was enjoined from making any disbursements from any

of his IOLA or business accounts. *(Id.* at 2.) The Trustee also obtained an order directing the

debtor to grant access to his business and financial records and case files. *(Order Directing*

*Debtor to Afford Trustee Access to Debtor's Records*, dated July 27, 2009 (ECF Doc. # 318).) In

addition, the trustee commenced an adversary proceeding to deny the debtor a discharge based

upon his failure to keep and preserve records and his withholding of his books and records from the Trustee. (*See Geitzer v. Siskin*, Adv. Proc. No. 08-1381.)[3]

### E.    The Other Escrow Accounts

During the chapter 11 case, the debtor's operating reports had disclosed only one IOLA account maintained at HSBC Bank. As the result of discovery, the Trustee's counsel learned that the debtor had maintained two additional IOLA accounts, one at Citibank, and one at Commerce Bank, which he had not previously identified. In addition, he had co-mingled his clients' recoveries with his own fees in those accounts. (*Application of Squire, Sanders & Dempsey L.L.P. Under 11 U.S.C. §§ 330 & 331 for First and Final Allowance of Fees and Reimbursement of Expenses Incurred as Substitute Counsel to the Chapter 7 Trustee from August 11, 2008 Through October 13, 2010 and Related Relief*, dated Apr. 21, 2011, at ¶ 11 (ECF Doc. # 333).) The Trustee's counsel requested additional documents, including bank statements and canceled checks, pertaining to the newly disclosed IOLA accounts. (*Id.* at ¶ 12.) When the debtor failed to produce the requested information in a timely manner, the Trustee procured yet another order requiring production. (*Order Directing Debtor-Defendant to Produce Documents*, dated Mar. 26, 2009 (ECF Doc. # 8, filed in Adv. Proc. No. 08-1381).)

The escrow accounts ultimately proved to be the debtor's professional undoing. By order dated June 4, 2009, the debtor was suspended from the practice of law because he was unable to account for decreases in his escrow accounts or transfers between escrow accounts. *In the Matter of Barry Siskin*, 880 N.Y.S.2d 276 (N.Y. App. Div. 2009). He was subsequently disbarred by order dated October 12, 2010, as a result of his failure to seek reinstatement, his

---

[3]    The adversary proceeding is still pending.

11

failure to withdraw from matters in which he was counsel of record, and his failure to respond to

inquiries by the Disciplinary Committee when eleven former clients and/or new counsel sought

help from the Disciplinary Committee in locating their case files. *See In the Matter of Barry S.

Siskin*, 909 N.Y.S.2d 411 (N.Y. App. Div. 2010). In addition, the Appellate Division appointed

an attorney to oversee the return or transfer of client files based upon the debtor's non-

responsiveness to the Disciplinary Committee's inquiries.[4]

F.    The Pending Applications

The Trustee's Final Report attached his application for compensation and expenses. The

cap on his commission under 11 U.S.C. § 326 is $25,934.50, and he seeks this amount. The

Trustee also submitted time records indicating that he spent 161.1 hours on the case, and this

represented services valued at $75,923 under the "lode star" method. In other words, he is

seeking approximately one-third of what he would charge a client (the Trustee is a lawyer) for

the amount of time he spent on the case.

The three professionals initially sought final fees aggregating $343,485. According to the

United States Trustee, they have agreed to reduce their requests by approximately 45%, and now

seek the aggregate amount of $187,925.90. (*See Statement of the United States Trustee with

Respect to Applications for Final Commissions, Compensation and Reimbursement of Expenses,*

dated July 1, 2011 (ECF Doc. # 331).)

---

[4]       The Trustee and the debtor had entered into a Consent Order allowing the debtor to pay settlement monies,
aggregating approximately $70,000, to five clients. (Consent Order Modifying "Freeze Provision" Contained in the
Court's Prior July 16, 2009 Order to Show Cause, dated Nov. 10, 2009 (ECF Doc. # 16, filed in Adv. Proc. No. 08-
1381).) The debtor failed to pay four of the five clients, and the Trustee subsequently entered into a stipulation with
the receiver pursuant to which the receiver agreed to make those payments. (*See Stipulated Order Between Trustee
and Debtor's State-Court Appointed Receiver Further Modifying this Court's Prior July 16, 2009 Order to Show
Cause,* dated July 20, 2011 (ECF Doc. # 20, filed in Adv. Proc. No. 08-1381).)

Finally, the Trustee and his professionals seek expenses aggregating $8,454.78

As noted, three former employees of the debtor filed objections to Final Report. Nancy Rodriguez and Brian Young contend that the Trustee failed to pay their salaries for up to six weeks, and both claim that they are owed approximately $4,000. The Final Report contains a schedule of unpaid administrative creditors, but does not list them. Thomas Wojtaszek is listed as an administrative creditor, but contends he is owed more than reflected in the Final Report. The Trustee has replied to these objections, and the Court will address them at a separate hearing

The debtor submitted a 37 page objection to the Trustee's Final Report and his professionals' fee applications. (*See Siskin Declaration.*) The thrust of his objection, laced throughout with *ad hominem* attacks directed at the Trustee and his professionals, may be summarized as follows: the Trustee and his professionals performed unnecessary work that did not benefit the estate and was undertaken for the sole purpose of benefiting the Trustee and his professionals and destroying Siskin's practice.[5]

## DISCUSSION

Bankruptcy Code § 330 authorizes a bankruptcy court to award reasonable compensation for actual, necessary services, as informed by the criteria described in § 330(a)(3) and (a)(4). Although the debtor views the activities of the Trustee and his professionals as a vendetta against him designed to generate fees for themselves, and even blames the Trustee for his disbarment, I find that the services were reasonable and necessary in light of the circumstances of the case. The essential problem in this case was the debtor's need, on the one hand, to continue his law

---

[5]   At times, Siskin complains about perceived injuries to his clients and his office staff. The Court will ignore these arguments since Siskin lacks standing to assert them.

13

practice and service his clients, and the Trustee's duty, on the other hand, to marshal the assets of

the estate, collecting amounts previously paid and accounts receivable to be paid in the future

that pertained to pre-petition services.  These competing goals placed the Trustee and the debtor

in the same physical office needing the same records, and at times, the same office staff.

The natural tension created by this situation was exacerbated by the debtor's inability to

maintain adequate records or willingly provide information relating to the fees earned or to be

earned in connection with his inventory of cases.  His poor record keeping and lack of

appreciation for the duties imposed on a bankruptcy debtor contributed to the sanctions award in

favor of American Transit, the failure of the chapter 11 case and its conversion to chapter 7, and

the high costs associated with the Trustee's need to obtain court orders compelling the debtor to

provide information that he was required to provide under the Bankruptcy Code without the need

for additional orders.  The Trustee's efforts benefited the estate as he managed to collect

$453,055.03 with little or no help from the debtor.  Furthermore, the Trustee is seeking

approximately one-third of his actual time charges, and the professionals have agreed to a 45%

haircut, allowing the Trustee to fully satisfy the chapter 7 administrative expenses and pay a 10%

distribution to the chapter 11 claimants.  Lastly, while the debtor blames the Trustee for the

destruction of his law practice and his ultimate disbarment, the misappropriation or inability to

account for escrowed funds rests with the debtor.

Accordingly, the debtor's objection is overruled, but this does not resolve all of the

outstanding matters.  As noted, three former employees have objected to the Trustee's Final

Report, and the Trustee is directed to obtain a hearing date to hear those objections and give

notice to the objecting parties.  In addition, the Trustee's objection to the debtor's discharge is

14

(FAX)                                                                P.016/016

still pending. The Trustee is also directed to contact chambers to obtain a date for a pretrial conference, and provide the debtor and his counsel with notice of that conference.

So ordered.

Dated: New York, New York
       October 13, 2011

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge

Official Form 17
(12/04)

# United States Bankruptcy Court

SOUTHERN District of NEW YORK

In re  BARRY SISKIN
        Debtor

Case No. 02-10373-smb

Chapter 7

*[Caption as in Form 16A, 16B, or 16D, as appropriate]*

## NOTICE OF APPEAL

BARRY SISKIN , the plaintiff [~~defendant or other party~~] appeals under 28 U.S.C. § 158(a) or (b) from the judgment, order, ~~or decree~~ of the bankruptcy judge (~~describe~~) entered in this ~~adversary~~ Chapter 7 Bankruptcy proceeding [~~or other subject of appeal~~] on the  13 Th  day of  October, 2011
                                                                 (month)      (year)

The names of all parties to the judgment, order, ~~or decree~~ appealed from and the names, addresses, and telephone numbers of their respective attorneys are as follows:

BARRY SISKIN — Debtor
DAVID A. SCHRADER, ESQ . Atty. for Debtor, BARRY SISKIN
SCHRADER + SCHOENBERG, LLP
711 Third Avenue  NYC, NY
(212)-986-4888

Dated:  October 27, 2011

Signed: _____  is
~~Attorney for Appellant~~ (or Appellant, ~~not~~ represented by an Attorney)
DAVID A SCHRADER, ESQ

Attorney Name: SCHRADER & SCHOENBERG, LLP

Address: 711 Third Avenue
NYC, NY

Telephone No: (212)-986-4888

If a Bankruptcy Appellate Panel Service is authorized to hear this appeal, each party has a right to have the appeal heard by the district court. The appellant may exercise this right only by filing a separate statement of election at the time of the filing of this notice of appeal. Any other party may elect, within the time provided in 28 U.S.C. § 158(c), to have the appeal heard by the district court.

*If a child support creditor or its representative is the appellant, and if the child support creditor or its representative files the form specified in § 304(g) of the Bankruptcy Reform Act of 1994, no fee is required.*

U.S. BANKRUPTCY COURT
FILED
2011 OCT 27  P 2: 54

JS 44C/SDNY
REV. 1/2008

**CIVIL COVER SHEET**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

Appellant — Barry Siskin    Appellees- Multiple Debtors Listed
on Notice of Appeal

ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)    ATTORNEYS (IF KNOWN)

Appellant - Pro-se on Appeal
Appellant's Attorney on Bankruptcy in general    Multiple Appellees' Attorneys and Multiple Pro-se
and for communications on appeal    Appellees - Listed on Notice of Appeal

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

28 U.S.C. 158    Appeal from U.S. Bankruptcy Ct - S.D.N.Y.

Has this or a similar case been previously filed in SDNY at any time? No? [ ] Yes? [X]  Judge Previously Assigned _____

If yes, was this case: Vol. [ ]  Invol. [ ]  Dismissed: No [ ]  Yes [ ]  If yes, give date _____  & Case No. _____

(PLACE AN [x] IN ONE BOX ONLY)    NATURE OF SUIT

* David A. Schrader, Esq.
Schrader Schoenberg, LLP
711 Third Ave, NYC, NY
(212) -986-4888

[table illegible]

Check if demanded in complaint:

[ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.?
IF SO, STATE:

DEMAND $ _____  OTHER _____  JUDGE _____  DOCKET NUMBER _____

Check YES only if demanded in complaint
JURY DEMAND: [ ] YES [ ] NO    NOTE:  Please submit at the time of filing an explanation of why cases are deemed related.

*(PLACE AN  x  IN ONE BOX ONLY)*                                    **ORIGIN**

☒1 Original   ☐2a. Removed from   ☐3 Remanded from   ☐4 Reinstated or   ☐5 Transferred from   ☐6 Multidistrict   ☐7 Appeal to District
   Proceeding        State Court          Appellate Court      Reopened          (Specify District)      Litigation          Judge from
                 ☐2b. Removed from                                                                                         Magistrate Judge
                     State Court AND                                                                                        Judgment
                     at least one
                     party is pro se.

*(PLACE AN  x  IN ONE BOX ONLY)*              **BASIS OF JURISDICTION**              *IF DIVERSITY, INDICATE*
                                                                                     *CITIZENSHIP BELOW.*
☐1 U.S. PLAINTIFF   ☐2 U.S. DEFENDANT   ☒3 FEDERAL QUESTION   ☐4 DIVERSITY          *(28 USC 1322, 1441)*
                                           (U.S. NOT A PARTY)

**CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)**

(Place an [X] in one box for Plaintiff and one box for Defendant)

|   | PTF | DEF |   | PTF | DEF |   | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1 | [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 | [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [ ] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2 | [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 | [ ] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

▬▬▬▬▬▬▬ ADDRESS(ES) A ▬▬▬▬▬▬▬

APPELLANT'S
BARRY SISKIN
90 SCHRADER, DAVID A.
SCHRADER & SCHONDERG LLP
711 Third Ave.
NYC, NY
(212)-986-4886

▬▬▬▬▬▬▬ ADDRESS(ES) AND COUNTY(IES)

Appellees
Multiple Appellees listed on Notice of Appeal

▬▬▬▬▬▬▬ ADDRESS UNKNOWN
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN U▬▬▬ WITH REASONABLE DILIGENCE TO ASCERTAIN THE
RESIDENCE ADDRESSES OF THE FOLLOWING ▬▬▬▬ 5 APPELLEES

NOT APPLICABLE

Check one:   THIS ACTION SHOULD BE ASSIGNED TO:   ☐ WHITE PLAINS   ☒ MANHATTAN
(DO NOT check either box if this a PRISONER PETITION.)

DATE Sept. 7, 2011   SIGNATURE OF ATTORNEY OF RECORD                ADMITTED TO PRACTICE IN THIS DISTRICT
                                                                    ☒ NO
RECEIPT #        *[signature]*          ; Pro Se on               [ ] YES (DATE ADMITTED   Mo. _____   Yr. _____)
                                          Appeal                  Attorney Bar Code #

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____                                  so Designating

J. Michael McMahon, Clerk of Court by _____ Deputy Clerk, DATE _____

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

    BARRY SISKIN,

            Debtor,

                              Case No. 02-10373 (SMB)

                              Chapter 7

## DEBTOR'S DESIGNATION OF
## RECORD AND ISSUES ON APPEAL

    This is an appeal from a Memorandum, Decision and Order approving the Chapter 7 Trustee's and his appointees' Fees and Disbursements request, which were objected to by the Debtor/Voluntary Petitioner.

    As a result of the nature of the underlying motion now up on this appeal, the Trustee's reply raised new points of fact and/or law, some untrue, which could not be properly disputed by any post-Reply papers by the Debtor, which were not authorized by the Court's motion briefing schedule.

    Trustee Geltzer's initial illegal attempt to literally take over the Debtor's law practice (1) by, without warning, bashing down and replacing the keys and locks to the Debtor's law offices, and (2) putting up a sign that stated "Law Office of Robert Geltzer" and (3) while committing (1) and (2), supra, in an

unannounced Friday evening visit, telling the Debtor's law practice's Office Manager, who was working late, that he, Geltzer, was now her "boss", all the while Geltzer was committing other atrocities and illegalities, were *then roundly slapped down by the Court (Bernstein, J.)* as a result of a subsequent immediate emergency motion that was prepared over the weekend by the Debtor's counsel, Schrader & Schoenberg, in which the Judge overruled his illegal action.

Nevertheless, <u>the ruling</u> by <u>Judge Bernstein restoring the status quo ante</u> to the true and only legal "Attorney-Of-Record" on the cases in the Debtor's law practice, to the Debtor himself, "Barry Siskin, Attorney-at-Law", <u>was effectively de facto overcome and overruled by Trustee Geltzer's</u> then taking any and all steps to render it difficult to impossible for the Debtor to continue to properly run his practice to the direct detriment of the Bankruptcy Estate and its Creditors, much less to fully comply with all directives of this Court, for the sole purpose to generating wholly unnecessary fees and disbursements to the Trustee and his cohorts.

Appellant, Barry Siskin, the Chapter 7 Debtor, as and for his Designation of the Record and Statement of Issues on appeal from the Court's October 13, 2011, Memorandum, Decision and Order, pursuant to Rule 8006 of the Federal Rule of Bankruptcy Procedure, respectfully designates the following items to be included in the Record, and states the following issues for the appeal:

2